**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

ANTHONY JOSEPH BROWN
by and through his father,
JOSEPH DAVID BROWN,

                           Plaintiff,

v.                                           CIVIL  ACTION  NO.  3:09-0279

CABELL COUNTY BOARD OF EDUCATION,
WILLIAM A. SMITH in his official capacity as
superintendent of Cabell County Schools, and
GREG WEBB in his official capacity as principal of
Huntington High School,

                           Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before this Court are Plaintiff's Motion for Temporary Restraining Order (Doc. 2) and Plaintiff's Motion for Preliminary Injunction (Doc. 3).  At this stage, Plaintiff has failed to make the showing necessary for preliminary relief.  He has not shown that he is likely to succeed on the merits, that the balance of harms tips decidedly in his favor, or that the public interest compels the issuance of such an order.  For these reasons, more fully explained below, the Court **DENIES** Plaintiff's motions.

**Background**

The events relevant to this case can be divided into two categories.  The first, those in which Plaintiff, Anthony Brown, was personally involved, can be described rather simply.  Brown is a freshman at Huntington High School.  On March 17, 2009, he wrote the words "Free A-Train" on both of his hands in felt tipped marker.  The message was an obvious reference to the detention of

Anthony Jennings, commonly known as "A-Train," who is currently facing criminal charges –
including the shooting of a Huntington police officer. (According to Plaintiff's counsel the message
was written as a show of solidarity for Jennings, who had come to Plaintiff's defense when other
students were picking on him.)  During the lunch period Brown asked to use the restroom and
Assistant Principal Archer noticed the message on his hands.  Archer gave Brown the option of
washing the message from his hands or serving ten days suspension.  Brown initially did wash the
message from his hands but later elected to re-write it.  Archer again warned him of the
consequences, but Brown declined to remove "Free A-Train" from his hands and was placed on a
ten-day suspension.  His father was given a notice of suspension, which states the grounds for
suspension were "disruption of the educational process."  *See* March 17, 2009, Notice of Students
Suspension, Pl.'s Ex. A Doc. 1-2.

     Although there is no evidence that Brown himself was involved in a larger set of events,
additional background is necessary to put the school's decision in context.  Huntington High School
has recently been confronted with the problem of gang activity.  Members of one gang in particular,
the Black East Thugs (commonly referred to simply as "BET"), are known to have threatened and
even assaulted other students.  Huntington High School Principal, Gregg Webb, testified about one
incident in which BET members physically assaulted a Huntington High Student who refused to join
them.  The student had moved from New Jersey and BET members speculated that he might have
been involved in a big city gang .  He denied any such association and declined an invitation to join
BET.  After being rebuffed, BET members boarded this student's bus and attempted to follow him
home.  The student thwarted the initial act of aggression by calling his father for a ride home, but
BET members assaulted him on March 3, 2009.  The next day, March 4, 2009, suspected BET

members threatened to shoot two fellow students in the back of the head.  Principal Webb testified that six members of the gang had been expelled for their involvement in the above incidents. Because of these and other acts, students at Huntington High were understandably apprehensive about gang activity – particularly that of BET.

Jennings's arrest came on the heels of the BET incidents at Huntington High School.  On March 4, 2009, Jennings was arrested and charged with two counts of armed robbery and one count of attempted murder of a police officer.  He allegedly fired on Huntington Police Officer Ryan Bentley while the officer was in hot pursuit.  Local media reported extensively on the shooting, Jennings's alleged role, and his background as a former student at Huntington High.  According to testimony, many at the school thought Anthony Jennings was associated with BET.  He had been enrolled as a student at Huntington High School until February of 2009, and many students perceived him to be a member of the gang.  BET members and other supporters were present at his arraignment and noted in the media reports.

Visible support for Jennings also cropped up at Huntington High School in the weeks following the arrest.  Some students began to wear "Free-A-Train" T-Shirts to school.[1]  Other students became frightened, concerned that the shirts were an outward display of BET membership which they associated with a possible threat of violence.  Counselors and teachers reported student complaints about the "Free A-Train" shirts.  At least one student broke down crying out of fear that BET gang members would be coming to school.  A few students asked to leave class early because of the shirts.  Parents began to call the school, informing administrators that they refused to send

---

[1]Many of these T-shirts simply said "Free A-Train."  Others, more elaborately created, bore a picture of Jennings emblazoned across the front.

-3-

their children out of concern over BET and "A-Train's" supporters.  One student even told a counselor that he expected a shooting to occur at school and asked if Huntington High School officials were ready for such an incident.  More generally, teachers complained that students were distracted by the situation and had trouble concentrating in class. Clearly, the students and teachers were experiencing significant anxiety and tension which interfered with the educational process.

Because of mounting problems created by the T-shirts, administrators at Huntington High School verbally agreed to establish and enforce a policy banning the "Free A-Train" slogan. According to Principal Webb, most students either changed or turned their shirts inside out when requested to do so. He stated that he did not have an opinion about whether the shirts were a promotion of gang violence or a statement of solidarity with Jennings, but that the policy was enacted because the shirts disrupted the educational process.  When asked whether students would be permitted to wear "I support Officer Bentley" T-shirts, Webb stated that if those shirts caused disruption, action would be taken to end the disruption.  Webb testified that, as of the day of the hearing, the school was still experiencing problems with the "Free A-Train" slogan, and that very morning there had been an instance of graffiti on the gym floor.

There is no evidence that Anthony Brown has ever been involved with BET or any other gang.  Nor is there evidence that he was perceived personally to be a threat to student safety.  The message on his hand, however, clearly fell within the school's ban of the "Free A-Train" slogan and came at time when administrators reasonably believed  students were worried about gang activity and support for Anthony Jennings.  The Court's analysis must consider not only Brown's actions, but also the larger circumstances surrounding them and the school's decision to disallow any "Free A-Train" message.

-4-

## Standard of Review

"[A] preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997) (quoting *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)).  In deciding whether or not to grant preliminary relief, a court must consider four factors:

> (1)   the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
> (2)   the likelihood of harm to the defendant if the requested relief is granted,
> (3)    the likelihood that the plaintiff will succeed on the merits, and
> (4)   the public interest.

*Manning,* 119 F.3d at 263 (quoting *Direx Isreal, Ltd. v. Breakthrough Med. Corp*, 952, F.2d 802, 812 (4th Cir. 1991).  Ordinarily a court must first "balance the 'likelihood' of irreparable harm to the plaintiff, against the 'likelihood' of harm to the defendant."  *Blackwelder Furniture Co. of Statesville, Inc. v. Selig Mfg. Co., Inc.* 550 F.2d 189, 195 (4th Cir. 1977) ("*Blackwelder*") (internal quotations omitted).  If the Court determines that the balance of harm favors the plaintiff it must then proceed to consider the likelihood of success on the merits and the public interest.  *Id.* at 195-96.  In a case involving the alleged depravation of a First Amendment rights, however, the analysis may be somewhat different.  The determination of irreparable harm is often inseparably linked to the claimed violation of the constitutional right.  *Giovani Carandola Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002).[2]  Consequently, in a First Amendment case, the likelihood of success on the merits

---

[2]The "loss of First Amendment rights, for even minimal periods of time unquestionably (continued...)

must sometimes be considered before the balancing of harms.  *See id; Newsome v. Albemarle County Sch. Bd.*, 354 F.3d 249, 254-55 (4th Cir. 2003).

## II.     The Plaintiff Is Unlikely to Succeed on the Merits of His Case

One of the principal guarantees of the First Amendment is the right to free speech; it bars the government "from dictating what we see or read or speak or hear." *Newsome,* 354 F.3d at 255*;* U.S. Const. amend. 1.  It is a long recognized principal of Supreme Court jurisprudence that neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Comty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  "Just as the public on the street corner must, in the interest of fostering 'enlightened opinion' tolerate speech that 'tempts the listener to throw the speaker off the street,' public educators must accommodate some student expression even if it offends them or offers views or values that contradict those that the school wishes to inculcate." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 280 (1988) (quoting *Cantwell v. Connecticut*, 310 U.S. 296 (1940)) (internal brackets and citations omitted).

Despite the protections of student speech, courts have recognized that "a public school student's First Amendment rights are not coextensive to those held by others in other contexts." *Newsome*, 354 F.3d at 255.  School administrators have a duty to "facilitate education and maintain order and discipline." *Id.*  Recognizing this duty, "the Supreme Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the Schools." *Id.*

---

[2](...continued)
constitutes irreparable injury." *Giovani Carandola,* 303 F.3d at 520-21 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

(quoting *Tinker* 393 U.S. at 507).  The most long-standing exception to the right of unfettered free speech in schools is speech that "for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others."[3] *Tinker*, 393 U.S. at 513.  This speech is "of course, not immunized by the constitutional guarantee of freedom of speech." *Id.*

The "material disruption" exception to free speech, established by *Tinker,* is a narrow one. School officials may not prohibit a particular expression of opinion simply out of a "desire to avoid the discomfort and unpleasantness that always accompanies an unpopular viewpoint." *Id.* at 509. Nor is the "remote apprehension of disruption" a sufficient justification. *Newsome*, 354 at 255. Rather, a school must demonstrate "specific and significant fear of disruption." *Id.* "[I]f a school can point to a well-founded expectation of disruption – especially one based on past incidents arising out of similar speech – the restriction may pass constitutional muster." *Id.*

During the hearing, the Cabell County School Board presented evidence of specific incidents in which speech like that of Brown's had caused a material and substantial disruption at school, by inhibiting other students from attending or remaining attentive during class.  This disruption was based upon a perception, by students, that the "Free A-Train" slogan was a sign of gang affiliation and possible violence.  The perception associated with the slogan led to real fears, which had

---

[3]In the decades since *Tinker* was decided, the Court has established other exceptions to general right to free speech in schools.  In *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) the Court held that schools may ban speech if it is lewd, vulgar, indecent, or plainly offensive.  In *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), the Court allowed a school to suppress certain speech when it bore the school's imprimatur.  Most recently in *Morse v. Federick*, 551 U.S. 393 (2007) the Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use."  None of these exceptions apply here.

consequences on students' ability to learn and threatened to undermine their confidence that school administrators could keep the school safe. The school's decision to disallow this slogan, so that they could maintain order and ensure a sense of security among their students, was a response not to the content of the message, but to the disruption it created.

It should again be emphasized that there is no evidence Anthony Brown is associated with BET or any other gang. Indeed, it is probable that his display of support for Jennings was undertaken for personal reasons independent from the larger context of gang activity at the school.[4] The "Free A-Train" message can easily be taken as commentary on a pending criminal court case of serious public concern – the overwhelming probability is that it would be protected speech outside of the school context. Evidence shows, however, that within the halls of Huntington High School this message took on different connotations and led to a material and substantial disruption of the educational process. At this stage in litigation, the disruption caused by students' perception of the "Free A-Train" slogan is sufficient for the Court to find Plaintiff unlikely to succeed on the merits. Because the school's discipline of Anthony Brown was related to specific and significant fear of disruption based upon contemporaneous incidents arising from similar speech, their actions are likely to pass constitutional muster.

---

[4]During testimony Principal Webb stated that he knew at least some of the students displaying support for Anthony Jennings were, in fact, members of BET. The evidence has not established, however, that Jennings was a member of this gang or that the majority of those expressing support for him were members of gangs or condoned violence.

**II.**     **Neither the Balance of Harms nor the Public Interest Weigh Decidedly in Plaintiff's Favor.**

This case presents serious interests on both sides.  Plaintiff faces a restriction on his ability to express an opinion on a matter of public importance; the school faces a challenge to its responsibility, not only to create a feeling of safety and security among students, but also to fulfill its educational mission.  As the preceding analysis demonstrates, the U.S. Supreme Court has recognized a school's right to restrict speech that interferes with the educational process. As such, this Court is in no position to say that the potential harm to Brown's ability to speak outweighs the potential harm to the school.   Brown does face other potential harm through the denial of this injunction, but neither does that harm outweigh that harm likely to be borne by the school if the injunction were issued.

In order to prevent Brown from displaying his message at school, administrators suspended him for ten days.  This suspension deprives him of his formal education at the school for that time and it will likely appear on his academic record.  The duration of the suspension is, however, largely within Brown's control.  At the hearing, counsel for Defendants stated that Brown was free to return to school if he promised not to display the "Free A-Train" slogan again.  Thus, although he was ordered  to serve a ten-day suspension, he has as much power as this Court to end it.  Additionally, the work that he has will miss can be made up.  Although Brown will be denied access to his teachers and the resources of the school, the harm caused by this temporary loss is probably not "irreparable."  Finally, the notation of a ten-day suspension on Plaintiff's academic record can be expunged if Plaintiff is successful on the merits.

Balanced against what are likely to be temporary hardships for Plaintiff are significant harms likely to be incurred by the school if the injunction were issued.  These harms include an increased

potential for disruption like that which has already occurred.  Not only would Brown be permitted to display the "Free A-Train" slogan, but this Court would have sent a clear message to other students that they would be free to do so as well.  Such a decision could undermine student confidence in their administrators' ability to deal with what many see as support for gang activity associated with violence and criminal conduct.

In the absence of Plaintiff's likelihood of success on the merits, the public interest in this case is largely aligned with that of Defendants.  Consequently, the Court cannot find the *Blackwelder* factors weigh in favor of preliminary relief.  The Court must **DENY** Plaintiff's motions for a temporary restraining order and preliminary injunction.

## CONCLUSION

The right to free speech, implicated in this case, is one of the most firmly entrenched guarantees of the United States Constitution.  Speech, even at school, cannot be suppressed merely because those with authority to do so disagree with the message.  But, that is not what has happened here.  At this stage, the evidence shows that displays of the "Free A-Train" slogan, like Anthony Brown's written message, threatened to exacerbate student fears and substantially disrupt the educational process.  Because this speech conflicts with the duty of the Defendants to maintain order and security at school, it is unlikely that Defendants violated Brown's constitutional rights when they restricted his speech.  Plaintiff has not shown that he is likely to suffer irreparable harm which outweighs that of the school if an injunction were to be granted.  Additionally, he has not demonstrated that the public interest favors the issuance of an injunction.  For these reasons, both Plaintiff's Motion for Temporary Restraining Order (Doc. 2) and Plaintiff's Motion for Preliminary Injunction (Doc. 3) are **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:   March 30, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE