**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

ANTHONY JOSEPH BROWN
by and through his father,
JOSEPH DAVID BROWN,

        Plaintiff,

v.                              CIVIL  ACTION  NO.  3:09-0279

CABELL COUNTY BOARD OF EDUCATION,
WILLIAM A. SMITH in his official capacity as
superintendent of Cabell County Schools, and
GREG WEBB in his official capacity as principal of
Huntington High School,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is the Defendants' Motion for Summary Judgment (Doc. 74).  The Court heard argument on this motion, from all parties, at a hearing held May 24, 2010.  For the reasons explained below, the Court **GRANTS** the motion.  In making its decision, the Court has relied on deposition and hearing testimony submitted along with the defendants' motion.  Plaintiff did not contest this evidence in his response or offer any contrary evidence for the Court to consider.   As such, the facts in the record are uncontradicted; judgment to the defendants is appropriate as a matter of law.

**Background**

Plaintiff, Anthony Brown, is a student at Huntington High School.  On March 17, 2009, during the spring of his freshman year, he was given a ten-day suspension for writing the words "Free A-Train" on the back of his hands.  He argues that school administrators violated his First Amendment right to freedom of speech when they handed down the suspension.  He requests a

declaratory judgment that the school's actions were unconstitutional under the First and Fourteenth Amendments to the United States Constitution, an expungement of the suspension from his disciplinary record, compensatory damages, and attorneys' fees.

In order to understand Brown's message, and the school's proffered motivation for suspending him, it must be put into context. The term "A-Train" was a nickname for Anthony Jennings, a Huntington High School student who had been recently expelled at the time of Brown's suspension. On March 4, 2009, "A-Train" was accused of shooting a Huntington Police Officer – Ryan Bentley– while fleeing an armed robbery. Details of the shooting were widely distributed through the local media. Jennings was charged with attempted murder and two counts of armed robbery. He has since pled guilty to the attempted murder charge.

Jennings was widely perceived to be a member, if not the leader, of a gang known as the "Black East Thugs," or "BET" for short, which had a known presence at Huntington High School. The gang existed for about two years but had not caused significant problems at school. In March, 2009, their activities escalated and culminated in a series of events that posed more serious concerns. From the evidence it appears that the gang was made up predominantly of young men who attended Huntington High School, and they made an effort to attract attention and recruit new members there. Members often wore red pants to school, identified themselves on social networking sites as gang members, left gang-related graffiti throughout the school building, and generally made students and teachers aware of their membership in BET. Members would commonly skip class together (in fact, this was the reason Anthony Jennings was expelled). School administrators learned of several incidents of BET members disregarding rules of conduct at the school and engaging in acts of aggression to intimidate or even physically assault other members of the Huntington High School

-2-

community – particularly other students who were not members of the gang. Gang members would verbally assault faculty and staff who confronted them, at times cursing them outright in front of other students. Fights became more prevalent and some parents began to fear for their children's safety.

One extreme incident occurred on March 3, 2009, when gang members traveled by school bus to another student's home and fought with him, his parents, and his cousin. The student had recently moved from New Jersey and rumor had it that he had belonged to a gang in the big city. BET wanted to recruit him, but he had rebuffed their efforts. They decided to beat him in retaliation. The police were called and the group scattered, but the BET members involved were eventually identified by video footage on the bus and expelled. The day after the incident, BET members threatened to shoot two fellow students in the back of the head. Following this incident, a group of 12 parents went to the Cabell County Board of Education to complain specifically about that event and more generally about gang activity at the school.

After Anthony Jennings's March 4, 2009, arrest, administrators at Huntington High School were nervous about the reaction of BET and the disturbance it might cause in the school. Anthony's brother, Brandon Jennings, continued to attend school and outward displays of support for "A-Train" began to appear. A few days after the shooting, Antonio McKechin, a known BET member, taped a picture of Jennings to a white T-Shirt above the words "Free A-Train." Vice-Principal Rob Archer received a call from the science teacher, Mr. Lake, who told him McKechin became disruptive

during class by wearing the shirt and carrying on about why "A-Train" should be free.  On his was

to the office McKechin paraded through the hall  yelling "Free A-Train" and "free my boy."[1]

  In the days following McKechin's outburst, school administrators began receiving phone

calls from concerned parents.  Parents were anxious about the school's ability to control the gang

situation and about rumors that BET members would bring guns to school.  Some parents were

specifically concerned that gang members wearing slogans in support of "A-Train" would be

intimidating to other students.  Parents asked pointedly if the school could guarantee their children's

safety in such a situation and some indicated that they would pull their children out of school and

not allow them to return until the BET gang problem was dealt with.  Principal Gregg Webb

described the number of telephone calls as an "onslaught."

  At an early morning administrators' meeting, staff discussed the phone calls from parents.

Attendance Vice-Principal Baisden advised that the school had recently had an increased absentee

rate and that the number of students signing out early had increased as well.  They discussed the fact

that teachers had been emailing and leaving messages about interruptions in class due to students

talking about "A-Train," BET, and the "Free A-Train" slogan written in student notebooks.

Principal Webb testified that from these and other reports, it was evident that the "Free A-Train"

slogan was causing problems in the classrooms and with student and parent perceptions of safety

at Huntington High School.  He testified that the slogans intimidated other students and prompted

interruptions in classes, with some students leaving class. On March 14, 2009 Principal Webb sent

out a mass email advising teachers that the slogan "Free A-Train" and the t-shirts bearing the slogan

---

[1] The school diffused the situation by calling McKechin's mother, who convinced her son
to remove the taped photo and turn his t-shirt inside out rather than face suspension.

were banned from school.  Teachers were told to inform students of the ban in their first period classes.

Two days after the enactment of the ban, two students known to be members of BET wore screen printed shirts bearing the "Free A-Train" slogan and Anthony Jennings's face. Administrators took them from their lunch period in order to talk with them about their shirts and, as the defendants describe it, a near riot ensued.  Huntington Police Officer Ernie Blackburn, who is regularly stationed at the school, was forced to call for backup and six officers came to Huntington High School to help maintain order.  Plaintiff, Anthony Brown, spoke about the shirts with Vice-Principal Rob Archer during the incident.  Plaintiff asked what would happen if he were to wear a "Free A-Train" shirt to school the next day.  Vice-Principal Archer told him plainly that he would be suspended.

On the morning of March 17, 2009, Plaintiff approached Vice-Principal Archer in the hallway on his way into the school building.  Plaintiff displayed his hands which had "Free A-Train" written on them.  Archer reminded Plaintiff that they has spoken about this the previous day and told him he needed to wash the slogan from his hands.  Archer assumed that he would and did not follow him to the bathroom to make sure he did so.  According to the Vice-Principal, Plaintiff did not cause many problems and usually did as he was told.

Plaintiff approached Vice-Principal Archer again during the lunch period.   Archer noticed that Plaintiff still had the slogan written on his hands, in the same color and writing as before.  He had apparently not followed the instructions to wash it off.  This time Archer accompanied Plaintiff to the restroom and stood outside until he washed the message from his hands.  Plaintiff showed Archer his clean hands and the Vice-Principal thought the problem was resolved.

-5-

After Plaintiff's lunch period had ended, but while Archer was still eating, Plaintiff approached him again.  Plaintiff had written "Free A-Train" on the back of his hands for a second time and displayed the message to Archer once again.  Archer asked him what the problem was and reminded him that he could be suspended.  Plaintiff replied, "I've got to do what I've got to do. He's my dog."  Archer told Plaintiff to wait for him in the office as he finished lunch.  After he arrived in the office, Archer called Plaintiff's parents and informed them of the situation.  While Plaintiff was waiting for his father to pick him up, he showed off his hands and the "Free A-Train" slogan to other students nearby.  At least one student was uncomfortable with the situation and stated that she didn't want any part of it.  She called her parent, who released her from school for the rest of the day.  Plaintiff was sent home and issued a ten-day suspension.  His father was given a notice of suspension, which states the grounds for suspension were "disruption of the educational process."

It should be made clear that none of the administrators, and most likely none of his fellow students, considered Plaintiff to have been a member of BET or a likely threat of violence. Apparently, Plaintiff had his own reasons for visibly supporting Jennings, separate and apart from BET membership or gang affiliation.  Outside the school context Plaintiff's message of support would undoubtedly be speech worthy of stringent protection under the First Amendment. The question pertinent to this lawsuit, however, is whether the speech exceeded the bounds of protected speech given the school setting and context of events in which it occurred.

**Analysis**

### I.      Standard for Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II.     Defendants Could Lawfully Proscribe Anthony Brown's Speech in the School Setting

The First Amendment provides that "Congress shall make no law. . . abridging the freedom of speech." U.S. Const. Amend. I.  This is an expansive right that guarantees freedom of expression in wide-ranging matters of public discourse.  It is well settled that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep Cmty. Sch. Dist.,* 393 U.S. 503 (1969).  The constitutional rights of public school students, however, "are not automatically coextensive with the rights of adults in other

settings," because the Constitution does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) (quoting *Tinker*, 393 U.S. at 526 (Black, J., dissenting)).  Courts must therefore analyze First Amendment violations alleged by students, "in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (quoting *Tinker*, 393 U.S. at 506).

The Supreme Court addressed the constitutionality of school policies prohibiting students' right to free expression in *Tinker*.  393 U.S. 503.  There, the Court held that students are entitled to express their views freely, unless a prohibition on speech is "necessary to avoid material and substantial interference with schoolwork or discipline." *Id.* at 511.  The Court stated that student conduct which materially disrupts classroom work or involves substantial disorder is "not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. The opinion made clear, however, that to ban speech a school "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509.  In the absence of facts in the record indicating the reasonable anticipation of such disruption or breach of discipline, the Court found in favor of petitioners and held that the ban on their armbands was an unconstitutional infringement on those students' First Amendment right to freedom of speech. *Id.* at 513-514.

Typically, an analysis conducted pursuant to *Tinker*, requires a detailed review of the record, as past incidents of disruption form the most well-founded expectation of future disturbance. *Newsome v. Albermale County School Bd.,* 354 F.3d 249, 255 (4th Cir. 2003) ("If a school can point to a well-founded expectation of disruption – especially one based on past incidents arising out of

similar speech – the restriction may pass constitutional muster."). Speech expected to disrupt the education process or cause disorder may be prevented. *Id.* at 258.

In the decades since the Court decided *Tinker,* the right to free speech in schools has been limited in certain contexts. In *Bethel School District No. 403 v. Fraser*, the Court held that even if disruption is not imminent, school officials have authority to restrict or limit lewd or vulgar speech. 478 U.S. 675 (1986). This authority is due to the duty of school officials to "inculcate the habits and manners of civility as values in [students] conducive to happiness and as indispensable to the practice of self-government in the community and the nation." *Id.* at 681. Administrators may also restrict student speech when the message could reasonably be perceived "to bear the imprimatur of the school." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 270 (1988). In the most recent case the Supreme Court has made clear that school officials have the authority to ban speech which promotes illegal drug use. *Morse v. Frederick*. 551 U.S. 393 (2007). (Although the Court signaled that its analysis would have been different had it considered the plaintiff's speech to be of a political nature). *Id.* at 402-03.

While the Supreme Court has obviously worked to refine the contours of the First Amendment right to student speech in schools in the forty years since *Tinker,* the facts of this lawsuit fall squarely within the precedents of that fountainhead case. There is no lewd or indecent speech as in *Fraser,* no imprimatur of the school as in *Hazelwood*, and no promotion of illegal drug use as in *Morse.*[2] As such, it is necessary to look to lower court precedents further refining the

---

[2]*Morse* may prove to be an unwieldy precedent for lower courts to handle. *See* Symposium, Tinker *Turns 40: Freedom of Expression at School and Its Meaning for American Democracy* 58 Am. U. L. Rev. 1119 (2009). Although it took key principles from the *Fraser* analysis, it distanced its holding from the school's duty to "inculcate the habits and manners of civility" in students, on
(continued...)

original analysis of *Tinker* to gain clarity.  Two lines of cases are helpful on the instant facts.  The first are the cases most factually on point – dealing with displays of gang insignia or other indicia of gang membership in schools.  Second, a well-developed line of cases address the issue of students' rights to wear clothing bearing the Confederate flag in school provide guidance. While the relationship between shirts with Anthony Jennings's picture or slogans and shirts with the Confederate flag may not be immediately apparent, the tensions created by these sets of apparel are analogous and, therefore, the principles articulated in those case are instructive.

    A.  *Cases Dealing with Gang Related Apparel*

      In *Jeglin v. San Jacinto Unifed School District*, students attending elementary school, middle school, and high school within the same district brought suit to challenge a policy prohibiting students from wearing professional and college sports team insignia under the district's dress code policy.  827 F.Supp. 1459 (C.D. Cal. 1993).  The policy had been enacted in an effort to curtail gang presence on school grounds, as administrators believed that nearby gangs identified themselves by wearing the colors and logos of particular sports teams.  *Id.*  Based on *Tinker* and the facts in the

---

[2](...continued)

which *Fraser* was based.  *Morse,* 551 U.S. at 409.  ("Petitioners urge us to adopt the broader rule that Fredericks' speech is proscribable because it is plainly 'offensive' as that term is used in *Fraser*. We think this stretches *Fraser* too far . . .") (internal citations omitted).  In the end *Morse* appeared to rely on palpable fears and anticipation of disruption, recognized since *Tinker* as justifying the suppression of student speech.  551 U.S. at 408-09 ("The particular concern to prevent student drug abuse at issue here, embodied in established school policy, extends well beyond an abstract desire to avoid controversy.") (internal citations omitted).  These fears, however, seem to be of a different character than the fears of disturbance and disruption referenced in *Tinker*.  (In many ways the generalized fear of drug abuse in school seems to be precisely the "undifferentiated fear or apprehension of disturbance" *Tinker* warned against.  *See* 393 U.S. at 508-09.)  If taken outside the context of drug use, the holding in *Morse* could drastically extend *Tinker's* exception and swallow students' rights to express their opinions on controversial subjects.  For this reason, the Court views *Morse* as best limited to its facts – which in any case are far afield from those presented in this case.

-10-

record, the court found insufficient justification to ban sports team clothing in the elementary and middle schools. *Id.* at 1461-62. Despite conflicting evidence of gang activity and practice, however, the court did uphold the prohibition on such dress in the high school, finding the school met its burden of demonstrating that disturbance at school could result. *Id.* at 1462. So long as there is evidence of a potentially disruptive gang presence, then, a ban on gang related clothing may be permissible. Insignia or emblems, however, must clearly be associated with gang related disturbances, so that future disruption may be reasonably anticipated, in order to be lawfully proscribed. *See e.g. Chalifoux v. New Caney Independent School Dist.,* 976 F.Supp. 659 (S.D. Tex. 1997) (Catholic students could not be prohibited from wearing rosaries even though some gangs also used them as identification); *Stephenson v. Davenport Community School Dist.,* 110 F.3d 1303 (8th Cir. 1997) (school erred in forcing student to remove cross tattoo); *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243 (3d Cir. 2002) (Jeff Foxworthy "Redneck" t-shirt not shown to be related to racial tension exacerbated by school gang known as the "Hicks" but barring display of Confederate flag supported by evidence of past disruption).

### B. Cases Dealing with the Confederate Flag

More well developed than gang apparel cases is a line of case-law dealing with students displaying the Confederate flag on their clothing. Because of the large number of these cases, principles derived from *Tinker* have been well refined in this context. Because the fears leading to ban Confederate flags on clothes is analogous to fears claimed to have been generated from BET and the "Free A-Train" slogan in this case – namely intimidation through association with a dangerous of hostile group – they are instructive to the case at hand.

The critical issue that arises in Confederate flag cases is the basis for the belief that allowing flag clothing will lead to substantial disturbance or disruption of the educational system. The Sixth Circuit Court of Appeals, for example, has reviewed three such Confederate flag cases since the decision in *Tinker*. The first case was decided in 1972, and the events in question took place shortly after the 1966 integration of a formerly all-white school in Chattanooga, Tennessee. *Melton v. Young*, 465 F.2d 1332 (6th Cir. 1972). During the 1969 school year the student body had become racially polarized – at least in part due to continuing controversy over the use of the Confederate flag as a school symbol. *Id.* at 1332-34. Tensions rose to such a level that on several occasions it became necessary to call for police assistance and to close the school to restore order. *Id.* at 1333. Because of these problems, the school determined that it would cease using the Confederate flag as a symbol and prohibit its display on school premises. *Id.* at 1334. In 1970, the plaintiff, Bryan Melton, arrived at school wearing a jacket with a Confederate flag emblem on its sleeve. *Id.* He was asked to remove the jacket while in school, but declined. *Id.* After complaints about the jacket, he was called to the principal's office and given the choice of removing the jacket or leaving school; he chose to leave. *Id.* He was suspended indefinitely (until he agreed not to wear the flag) upon returning with the same jacket the next day. *Id.* This suspension was upheld by the circuit court of appeals in light of the racial tension and specific problems that the Chattanooga school district had experienced with the flag. The court focused on the level of disruption that had occurred in the recent past and the school's legitimate anticipation that the symbol's use would increase racial tensions.

Nearly thirty years later the Sixth Circuit Court of Appeals was again confronted with a confederate flag case – this time in a much different factual context. *See Castornia v. Madison*

-12-

*County School Board*, 246 F.3d 536 (6th Cir. 2001). In that case two high school students wore matching Hank Williams, Jr. t-shirts in honor of country music legend Hank Williams Sr.'s birthday. *Id.* at 538. Each of the shirts bore the likeness of Hank Williams, Jr. on the front and two Confederate flags on the back. *Id.* at 538-39. Upon being asked by the principal to change their shirts, each of the students refused, and then returned wearing them again the next day. *Id.* They were suspended indefinitely, until they agreed not to wear the shirts. *Id.* at 539. In reviewing record, the Sixth Circuit distinguished the facts from those present in *Melton,* where the flag ban had been in direct response to racial tension and unrest. *Id.* at 544. In contrast, the record in *Castornia* bore no evidence of racially animated disturbance either related to the flag or otherwise. *Id.* Because of the lack evidence justifying a reasonable apprehension of disruption, and because the ban appeared to be viewpoint specific (students were permitted to wear Malcolm X-inspired clothing), summary judgment in the school board's favor was reversed. *Id.*

A third Confederate flag case appeared before the Sixth Circuit Court of Appeals a mere two years ago. *See Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008). The context of this case was a middle-ground between the heated racial environment of recent integration in a school using the Confederate flag as its symbol and a country music fan's display of a Confederate flag on a shirt primarily worn to pay homage to a performer. The decision to ban displays of the Confederate flag in *Barr* came after a series of racially motivated disturbances that did not necessarily involve the flag itself. Tensions were high after an altercation at a basketball game sparked by a racial slur and the appearance of hostile and racist graffiti at the school. *Id.* at 557-59. Rumors swirled that violence would erupt at the school and, at one point, sheriff's officers were called to "lock down" the school and investigate racial incidents and threats of violence. *Id.* at 559. In this midst of this, the school

-13-

administrators decided to ban racially divisive symbols – including the Confederate flag. *Id.* at 560. After the ban was enacted, two students wore shirts to school bearing the flag. *Id.* at 560-61. Neither student was mentioned to have been linked to specific instances of racial violence or threats, nor were their shirts outwardly hostile – in fact, both had gone through most of the school day wearing their shirts without incident. *Id.* In reviewing these students' First Amendment claims, court determined the proper focus of *Tinker* was not "that the banned form of expression itself actually have been the source of past disruptions, [but rather] . . . whether the banned conduct would likely trigger disturbances such as those experienced in the past." *Id.* at 565. The necessary inquiry was "whether the school would reasonably forecast that the Confederate flag would cause material and substantial disruption to schoolwork and school discipline." *Id.* The court ultimately found that the suspensions were justified, not because the particular student plaintiffs were causing a disruption, but because their display of the flag contributed to the larger racial tension. There was direct evidence that this larger tension continued to cause specific disruptions through the school system, as concerned parents called administrators and came to school, and the school experienced an increased level of absenteeism, particularly among African-American students. *Id.* at 566. The court referred to this increased absenteeism as "the epitome of disruption in the educational process." *Id.*

While numerous courts other than the Sixth Circuit Court of Appeals have analyzed Confederate flag cases specifically and student free speech issues more generally, the preceding recitation of Sixth Circuit caselaw is consistent with the careful review of the factual record and prudent analysis of *Tinker* necessary in these types of cases. A recent decision from a district court

-14-

in this circuit has distilled additional principles from these and other Confederate flag cases across

the country, many of which are applicable to the present case as well:

> First, courts have allowed school officials to rely on past incidents of racial tension in anticipating a future disruption, even if those prior incidents did not directly involve the Confederate flag.. *Brogdon v. Lafon*, 217 Fed.Appx. 518, 525 (6th Cir.2007) ("nothing in *Melton* or *Tinker* requires evidence of a preexisting incident of the banned symbol evoking disruption"); *B.W.A. v. Farmington R-7 Sch. Dist.*, 508 F.Supp.2d 740, 749 (E.D.Mo.2007). Second, courts have not required that prior incidents of racial tension occur during actual classroom instruction, or even on the campus of the school that the student-plaintiff attended, to support a reasonable forecast of future disruption. *See, e.g., West v. Derby Unified Sch. Dist. # 260*, 206 F.3d 1358, 1362 (10th Cir.2000) (holding that school officials could support a ban on Confederate symbols in part because the Ku Klux Klan had distributed flyers off-campus)*; Phillips v. Anderson County Sch. Dist. # 5*, 987 F.Supp. 488, 493 (D.S.C.1997) ("the fact that some of the student confrontations have taken place across the street from [campus] does not eliminate them from the equation"). Third, incidents of prior racial tension need not necessarily be violent. See *Barr v. Lafon*, 538 F.3d 554, 566 (6th Cir.2008). Fourth, the plaintiff's own conduct need not disrupt or interfere with school activities before school authorities may enforce a ban on Confederate flag clothing. See, e.g., *West*, 206 F.3d 1358; *Farmington*, 508 F.Supp.2d at 750; *Phillips*, 987 F.Supp. at 491. Furthermore, the plaintiff's personal interpretation of the Confederate flag and its meaning is "largely irrelevant" in determining whether a ban on Confederate flag clothing is constitutionally permissible. *Farmington*, 508 F.Supp.2d at 749.

*Hardwick v. Hayward,* 674 F.Supp.2d 725, 733-34 (D. S.C. 2009).

C.  *Application of Principles to the Case at Hand*

In support of his claimed deprivation of First Amendment rights, Plaintiff proffers two related legal interpretations of *Tinker*.   First, he argues that *Tinker* allows suppression of student free speech only when that speech – by its context – creates a significant disruption to the educational process. Second, he argues that the focus should be on whether Brown's specific speech caused, or was likely to cause, a disruption. While the context of speech is critical to the constitutional analysis (all cases following *Tinker* examine the setting in which speech took place in order to determine whether it would be reasonable to anticipate a disruption), the contextual analysis is not so narrow that only student speech which particularly leads to a disturbance may be proscribed.  Also, it is clear that certain speech itself may be banned, not simply the manner in which it is delivered.  As explained above, the ultimate test is not whether a student's statement has led to a disturbance or disruption, but whether it could reasonably be expected to lead to one.  *See  e.g. West*, 23 F.Supp.2d at 1233-34 ("The fact that a full-fledged brawl had not yet broken out . . . does not mean that the district was required to sit and wait for one. If there are substantial facts which reasonably support a forecast of likely disruption, the judgment of the school authorities in denying permission and in exercising restraint will normally be sustained.") (internal citations omitted).

The fact that Brown's particular display of the "Free A-Train" slogan may have been passive and peaceful is not dispositive precisely because it took place in a larger context of hostility and intimidation.  Even if no one felt threatened by Brown's actions (and the facts are by no means clear on this point), school officials had the right to suppress his speech if they could reasonably predict his actions would contribute to the disturbance already taking place as a result of BET activity and the "Free A-Train" slogan.  Because students and parents had expressed fear over use of the "Free

A-Train" slogan in these circumstances, allowing Brown to persist in his display may have exacerbated the tension at school and increased those fears. Teachers and administrators could reasonably forecast that letting Brown persist in his action would feed the disruptions and interference already taking place as a result of those fears.

The facts presented in this case are directly analogous to those faced by the Sixth Circuit Court of Appeals in *Barr.* Just as there was an overarching threat of racial tension in that case, exemplified by specific instances of violence, there was widespread concern about gang presence at the Huntington High School campus punctuated by extreme episodes, such as the attack on the New Jersey student and student fears of intimidation or violence at the school. Just as there was a decision by administrators in that case to ban racially devise symbols, there was a decision by administrators at Huntington High School to eliminate a focal point of the problem – the "Free A-Train" slogan. Despite the fact that the particular plaintiffs in *Barr* had no direct connection with racial violence or even prejudice, their punishments were upheld. Similarly, Brown's suspension is justified despite the fact there is no direct evidence that students were afraid of him or his display particularly. As in *Barr,* the important facts in the record are the specific, contemporaneous disruptions caused by messages and displays of intimidation; concerned students and parents questioning the school administrators' ability to maintain order; and especially interruptions in the classes and increased rate of absences by students.

Similarly many of the lessons distilled from flag cases by the *Hardwick* court are directly applicable here. Past incidents of gang violence and increased tension caused by intimidation from gang members served as justification for the ban of a slogan clearly associated with that gang. *See Hardwick,* 674 F.Supp.2d 733-34 ("courts have allowed school officials to rely on past incidents of

-17-

racial tension in anticipating a future disruption, even if those prior incidents did not directly involve the Confederate flag").   Although the most extreme act of gang violence occurred off of school property it is still properly considered as the basis for reasonable anticipation of disruption at school. *See id.* ("courts have not required that prior incidents of racial tension occur during actual classroom instruction, or even on the campus of the school that the student-plaintiff attended, to support a reasonable forecast of future disruption").   Distraction from classes or intimidation from passive displays of support may serve as the basis of a disruption, just like physical acts of violence. *See id.*, ("incidents of prior racial tension need not necessarily be violent").   Although Plaintiff's particular act of disruption was passive it was proper to ban it because it fit in a larger circumstance of disruption and disturbance. *See id.* ("the plaintiff's own conduct need not disrupt or interfere with school activities before school authorities may enforce a ban on Confederate flag clothing"). Finally, that Plaintiff may have a different motivation or interpretation behind a message than others contributing to a disturbance, does not give him special license to display it. *See id.* ("Confederate flag and its meaning is "largely irrelevant" in determining whether a ban on Confederate flag clothing is constitutionally permissible").   For all of these reasons, the Court **FINDS** that the Cabell County School Board, and those administrators acting on its behalf, did not infringe upon Plaintiff Anthony Brown's right to free speech when they suspended him for writing "Free A-Train" upon his hands.

It is worth reiterating at this point that no one contends Brown's message was inappropriate simply because it expressed a disagreeable message.  This is not a *Fraser* type case where speech is lawfully suppressed because it is vulgar and offensive.  While the majority of students, teachers, and staff at Huntington High School likely disagreed with Brown's point of view and firmly

-18-

believed Anthony "A-Train" Jennings to be guilty of a heinous crime, that is not why the actions of the school's administrators were legal.  His speech would be worthy of vigorous protection outside of the school setting, and it is only because of the potential disturbance and disruption in that setting that he could be punished for expressing his views.  Likewise, while the recognition of Brown's message in the context of gang activity at Huntington High School is crucial to the holding of this opinion,  no one has argued and this Court does not believe that Brown himself was part of this gang activity.  Just as many students in the post-*Tinker* caselaw wanted to wear the Confederate flag as a proud symbol of their Southern heritage and not as a symbol of racial suppression, Brown appears to have supported Anthony Jennings for reasons entirely separate from an affiliation with his gang.  Even today, after Jennings has pled guilty to the charges against him, Brown has a firm constitutional right to stand up and support him if he so chooses.  This right must yield only when it begins to infringe on the ability of educators to safely and effectively carry out their duties to other students.

### Conclusion

For the reasons explained more fully above, because the actions of the defendants were in response to a reasonably anticipated disturbance at Huntington High School, the Court **GRANTS** the Defendants' Motion for Summary Judgment (Doc. 74).  The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:   May 26, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-19-